Ralph O. Banford v. Commissioner. Ralph O. Banford and Robin S. Banford v. Commissioner.
Banford v. Commissioner
Docket Nos. 35935, 35936.
United States Tax Court
T.C. Memo 1954-131; 1954 Tax Ct. Memo LEXIS 114; 13 T.C.M. (CCH) 813; T.C.M. (RIA) 54237; August 19, 1954, Filed *114 J. A. McIntosh, Esq., for the petitioners. Robert E. Johnson, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies consisting of additions to income tax for fraud against Ralph Banford for the years 1943 and 1944 of $638.85 and $566.95, and against Ralph and Robin Banford for the years 1945, 1946 and 1947 of $1,194.99, $843.58 and $1,502.03. The record indicates that the examination or audit of petitioners' returns which resulted in the determination of the deficiencies as stated also disclosed deficiencies in income tax for all years and that the deficiencies in tax were agreed to by petitioners. The only question accordingly is whether any part of each of the deficiencies in income tax was due to fraud with intent to evade tax. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioners are husband and wife, and reside in Middletown, Ohio. Ralph Banford, sometimes referred to as petitioner, filed individual income tax returns for the calendar years 1943 and 1944, and he and Robin Banford filed joint income tax returns for the calendar years 1945, *115 1946 and 1947 with the collector of internal revenue for the first district of Ohio. Prior to 1943, both Ralph and Robin Banford were employed by the Kalamazoo Stove and Furnace Company, of Kalamazoo, Michigan. Their place of employment was Middletown, Ohio, where the said company, sometimes referred to as the Stove Company, operated a retail store. Ralph Banford began work for the Stove Company as a mechanic in the Middletown store in 1934. He became manager in 1939, and continued in that capacity until 1943, when the operation was discontinued by the Stove Company and was taken over by Banford as his individual business. The store was thereafter operated under the name of Banford Heating Company. Neither Ralph nor Robin Banford had had any training or experience in keeping books, and their formal education had been limited to grade school and part of the first year in high school. The bookkeeping for the store when operated by the Stove Company had been done in Kalamazoo. The collections were deposited daily in a Middletown bank in the name of the Stove Company, and at the end of the day petitioner or Robin would mail the sales and deposit slips to Kalamazoo. The items which *116 were still for collection would thereafter be referred back to petitioners for their attention. Such files as were maintained by the store were the responsibility of Robin Banford. Ralph did whatever was necessary in the operation of the business, from menial and incidental chores to the selling and installing of furnaces and the supervising of the work of two or three employees, including Robin. After petitioner took over the store as his own enterprise, he continued the sale of Kalamazoo furnaces, stoves, fittings and parts. The Stove Company would ship a furnace, accompanied by a sight draft. The petitioner would take up the draft with a certified check on the Middletown bank. In case a stove or some other item was damaged in delivery, the factory would send out a replacement in the same manner and would thereafter give petitioner credit for the damaged article. In making sales, petitioner had an arrangement with the First National Bank of Middletown whereby the customer could make a note for the price of the item purchased, plus interest, and upon endorsement of the note by petitioner, an amount equal to the selling price of the article would be credited to petitioner's account *117 at the bank. Payments on the note would be made at the store at so much each month and petitioner or Robin would then make the payments on the note at the bank. The only book record of the store's operations was in the form of a cash or sales book. This book was maintained by Robin Banford. She obtained the data for the entries from petitioner at periodic intervals of six months or less. The sales tax due the State of Ohio was computed on the sales so recorded. In all of the years herein, sales were made which were not entered in the book. Sales which were not so entered included both time and cash sales. In the case of some of the sales made to customers for cash, petitioner would deposit the proceeds in the bank, but would not report them to his wife for entry in the book. For the years herein, there were three such books, one for 1943 and 1944, one for 1945, and a third for 1946 and 1947. On several occasions petitioner closed out other stores for the Stove Company, among them being stores in Cincinnati, Hamilton and Richmond. He would take his men and finish the jobs which had not been completed. He would collect money that was owing and transmit it to Kalamazoo. He would at *118 times work at night, helping some man finish up a job, and make no charge for it. He would purchase some of the stock remaining at these stores when they were closed out and place it in stock in his store at Middletown. He was advised by the Stove Company supervisor to take some items, odds and ends and damaged merchandise, without charge. Having received such items without charge, he did not take any amount with respect thereto into income or attribute any amount to them in his inventory, and when sales were made thereof, they were not entered in the cash or sales book maintained by his wife. Some of the items were obsolete and were never sold. Also, some of the work in closing out one or more of the stores was done prior to 1943. On January 23, 1945, petitioners purchased a residence in Middletown for $8,800. The mortgage indebtedness thereon at December 31, 1945, was $5,843.45, and at December 31, 1946, $989.12. On March 8, 1945, Ralph and Robin Banford purchased a business property, consisting of Lots 17 and 18 and the building thereon, in Middletown for $15,000. The building consisted of a store, with apartments above. Subsequently, during 1945, petitioners expended $2,000 *119 for improvements on the property. The apartments were let to tenants and petitioners received rent thereon in 1945, 1946 and 1947. In their return for 1945, petitioners reported $490 as rent received on the apartments and claimed a depreciation allowance of $84. The balances in the checking account carried in the name of Banford Heating Company with the First National Bank of Middletown, at December 31 of each of the years 1942 through 1947, and the total deposits made in that account during the years 1943 through 1947, were as follows: Total
Balances
Deposits
1942
$1,753.94
1943
9,288.26
$15,867.70
1944
7,981.65
23,016.67
1945
1,428.38
38,059.43
1946
1,689.34
33,504.03
1947
470.18
37,734.56
Included in the total deposits shown above were the proceeds of loans by the bank to petitioner. In the purchase of the business property in March, 1945, the petitioner obtained loans of $3,000 and $9,000, respectively. [1] There were also loans of $1,500 on February 13, 1947, and $1,650 on May 13 of the same year. At undisclosed dates following the war, petitioner endorsed the notes of some of his employees, who were returned veterans. The proceeds *120 of the notes were deposited in petitioner's account and he advanced the money to the different individuals by check. Thereafter petitioner would withhold the amounts required to pay off the notes from the weekly wages of the employees. Except possibly for one or two small loans, all such loans were repaid and petitioner lost nothing with respect thereto. Petitioner also had a savings account with the same bank. There were balances in this account at December 31, 1944, of $5,016.66, and at December 31, 1947, of $701.75. The account showed no balance at either December 31, 1945, or December 31, 1946. During the years 1944 through 1947, petitioner made various expenditures and purchases other than those which were ordinary and necessary expenses in the conduct of his business, or those previously set forth above. In *121 1944, $206.25 was placed in Government bonds, $160 was expended for shop tools, and $250 for office equipment. In 1945, $656.25 was expended for Government bonds, and $459.97 for shop equipment. In 1946, $574.67 was expended for shop equipment, and $90 for office equipment. In 1947, $250 was expended for shop equipment, $700 for an outdoor sign, $1,429.89 for a Ford truck, and $2,078.50 for a Buick automobile. During 1947, petitioner sold or cashed the Government bonds which had been purchased in 1944 and 1945. In the same year, he also sold a Buick sedan which had been purchased for $1,695 in 1936, for an undisclosed amount. During the years herein, petitioners carried life insurance policies with the Commonwealth Life Insurance Company of Louisville, Kentucky, and the Life Insurance Company of Virginia. The cash surrender value of the policies at December 31 of the years in question, on the life of each, was as follows: Ralph O.
Robin S.
Banford
Banford
December 31, 1942
$ 58.00
December 31, 1943
70.00
December 31, 1944
$ 59.00
82.00
December 31, 1945
92.00
95.00
December 31, 1946
126.00
114.00
December 31, 1947
162.00
133.00
At December *122 31 of each of the years 1943 through 1947, the petitioner had liabilities in the form of accounts payable of $85, $642.13, $1,907.50, $2,893.07 and $1,337.68, respectively. He had a further liability at December 31, 1947, for employees' tax withheld of $86.40. On December 31, 1946 and 1947, he was liable for old-age benefits withheld from salaries of his employees in the amounts of $8.48 and $25.94. Also at December 31, 1947, petitioners' liability on a note to the First National Bank was in the amount of $1,300. For all of the years 1943 through 1947, all of the income and deduction figures for making the income tax returns were compiled and assembled by petitioner on slips of paper. The entering of the figures on the return forms and the adding and subtracting and the applying of the tax rate percentages to net income were done for the years 1943, 1944 and 1945 by Martha Kistler, petitioner's stepdaughter, and for 1946 and 1947 by Lucille Veidt, who at one time had worked in some capacity for the Bureau of Internal Revenue. Martha had graduated from Middletown High School in June of 1943. Neither Martha nor Lucille Veidt had anything to do with the assembling or compiling of the *123 figures, but merely entered the figures on the return forms from the slips given them by petitioner. [2]
In September or October of 1948, petitioners' returns for the years 1943 to 1947, inclusive, were checked by a deputy collector of internal revenue. In making his examination, he consulted with an accountant who had been employed by and represented the petitioners. His findings and conclusions supplied the basis for the deficiencies in income tax determined and agreed to, and for the determination of the additions to tax for fraud which are in issue herein. In the determination of the deficiencies, the aggregate of the items shown for each year in the cash or sales book was taken as representing gross sales for that year. *124 The cost of goods sold and other business expenditures and items of deduction were accepted as reported on the various returns, except as to 1943. For 1943, no amount was shown as the cost of goods sold and respondent, for the purposes of his determination, arrived at cost of goods sold for that year by applying to "sales" the percentage of cost of goods sold to "sales" for 1944. For 1944 and 1946, the determination of greater income brought about the disallowance of small medical expense deductions and for each of the years 1946 and 1947, $1,068 was added to income as the rent received by petitioners on the apartments. The gross sales or receipts shown by the petitioners' cash or sales books and the total receipts, the cost of goods sold, and other business deductions as shown on the income tax returns for 1943 through 1947, were as follows: Cost of
Other Business
Gross Sales
Total Receipts
Goods Sold
Deductions
Per Books
Per Returns
Per Returns
Per Returns
1943
$15,339.57
$ 3,288.65
$1,858.64
1944
19,011.58
14,492.27
$ 9,509.69
2,992.15
1945
24,823.59
16,345.83
10,503.84
4,292.10
1946
25,906.57
20,448.61
12,472.44
4,702.39
1947
33,376.27
24,192.25
10,431.22
9,672.66
*125 The adjustments recited resulted in the amounts of net income and the deficiencies in income tax for the respective years determined by the respondent. The respondent's agent discussed the adjustments proposed with the petitioner and with his accountants, and petitioners in their replies filed herein to the affirmative allegations in respondent's answers admitted to the net income and the income tax thereon as determined by the respondent for all of the years herein. The net income reported, the tax thereon, the net income admitted to in the pleadings and the tax thereon, of Ralph Banford for the years 1943 and 1944 and of Ralph and Robin Banford for the years 1945, 1946 and 1947, were as follows: Net Income
Income Tax
Admitted
Income Tax
Reported
Reported
Net Income
Thereon
1943
$2,010.97
$ 43.47
$ 7,006.68
$1,321.16
1944
1,423.90
27.71
6,091.74
1,161.60
1945
1,594.39
51.71
10,072.12
2,441.68
1946
2,754.40
333.34
9,490.72
2,020.50
1947
4,143.31
529.00
13,741.88
3,533.06
The income tax deficiency for each of the years herein, or some part thereof, was due to fraud with intent to evade tax. Opinion The only question *126 for determination is one of fact, and is whether the income tax deficiency, or any part thereof, for each of the years 1943 to 1947, inclusive, which deficiencies have been agreed to and are not in issue here, was due to fraud with intent to evade tax. That the income as reported and the tax thereon were grossly understated is not disputed. It is the claim of the petitioners, however, that the understatements were due to ignorance and mistakes resulting therefrom, and not to fraudulent intent to evade tax. By statute, the burden of proving such fraudulent intent is on the respondent. Both parties, in presenting their evidence, have left much to be desired. The picture presented of record is quite confused, and it is not possible to know or determine the whole truth. Aside from the testimony of the Government agent as to his investigation and his conclusions therefrom, the story as told by oral testimony was largely that of Ralph Banford. The testimony of the agent, when considered in connection with matters developed at the trial, does not indicate that his investigation was as complete or thorough as it might have been, and in the testimony of Ralph Banford there were seeming or *127 apparent discrepancies and contradictions, particularly when examined in the light of other evidence, and some of his testimony we do not believe. Admittedly, the correct net income was not reported by the petitioners. It has not been determined in full by the respondent, and could not with any assurance of accuracy be determined on the record before us, even if it were in issue. The petitioners not only have admitted to the increased net income as determined by the respondent, but, in the course of the trial, Ralph Banford also admitted and testified to further and additional receipts for the years herein which were not entered in the cash or sales books and consequently were not included in the total receipts of the business as determined by respondent, namely, receipts from contracts under which no sales were involved but only services were rendered, proceeds from the sales of odds and ends of equipment and parts which had been received without charge in the closing out of the various stores for the Stove Company, and the proceeds of some of the sales which were financed through the bank. While the respondent has made no claim for further deficiencies on the basis of the above *128 admissions and testimony, he does argue, on brief, that his claim of fraudulent intent on the part of the petitioner is supported thereby. In the main, however, he relies for proof of such intent on the wide margin between the total receipts from business, as reported on the returns, and "the receipts per the sales journal books," the failure to report any amount on the 1946 and 1947 returns as rent received, and "the admitted discrepancy of 289 per cent" between the reported net income of $11,926.27 for the years 1943 to 1947, inclusive, and the net income of $34,476.17 for the said years as determined, and admitted to by the petitioners in the pleadings. And in refutation of petitioner's contention that the errors in reporting income were the result of mistakes due to ignorance and not fraudulent intent, he argues that Ralph Banford's own testimony shows that he had a keen insight into business, knew how to determine his total business profits, including the determination of the profit on individual sales, and how to make out his own tax returns; that his stepdaughter and Lucille Veidt merely entered on the return forms the itemized figures which he had furnished to them and that *129 the "gross understatements of income" on the returns could be attributed to no one but himself. It is the claim of the petitioners, based primarily on the testimony of Ralph Banford, that the amounts reported on the returns as total receipts from the business represented in fact his computation of total profits, namely, total receipts less cost of goods sold; that in arriving at the figures used, he compiled the receipts of the business directly from the contracts and deducted therefrom as the cost of the items sold the amounts at which they were shown on the Stove Company's price list; that he reported the resulting amounts to his stepdaughter and to Lucille Veidt as the total profits and not as total receipts or total sales; and that the understatement of income on the returns resulted from the deduction of the cost of goods sold a second time, a fact that he was not aware of until it was later called to his attention. In short, it is the claim of the petitioners that the discrepancies on the returns resulted from the erroneous entry of total profits as the total receipts from the business and from the deduction a second time of the cost of goods sold, and that, by reason of Ralph *130 Banford's ignorance and lack of understanding of the income tax returns, he did not become aware of the mistakes until they were later pointed out and explained to him. As further indication of the absence of fraudulent intent, the petitioners also stress their testimony that the cash or sales books from which the respondent made his determination of total receipts of the business did not reflect all business receipts and were not intended to do so, that only the sales which were subject to the Ohio sales tax were recorded therein, that the books were used only in reporting that tax, and were not used in preparing the Federal income tax returns. If we follow the reasoning aright, it is, in effect, that since the respondent in his determination did not and has not yet arrived at the full amount representing the total receipts from the business, and there are business receipts still unaccounted for, that fact, in some way, is indicative that the understatement of income on the returns was inadvertent and not with a fraudulent intent of evading tax. We observed and listened to Ralph Banford carefully and attentively while he was testifying, and we agree with respondent that he was *131 not nearly as ignorant of matters relating to the computing and reporting of his income and the tax thereon as he claimed to have been. According to his testimony, corroborated as to 1943, 1944 and 1945 by Martha Kistler, he assembled and compiled all of the data for the returns, which data, in addition to the usual business deductions, such as wages, interest and taxes, included allowances for depreciation and, beginning with 1944, the details of cost of goods sold, such as opening and closing inventories and purchases of merchandise during the year. After compiling and assembling these figures, he placed them on slips of paper and gave them to Martha Kistler and Lucille Veidt, who merely entered on return forms the figures which petitioner gave them and made the mathematical computations indicated. On the other hand, we do know that the cash or sales books, whether intended that way or not, did not reflect the total receipts of the business, and the agent, in making his investigation, could have so discovered if he had taken pains to procure and check the notes of customers which were in the hands of petitioner against the entries in the said books. Furthermore, we do not mean to *132 indicate that it could not have been possible for Martha Kistler and Lucille Veidt to have made mistakes such as were attributed to them, or that the extremely wide margin by which net income was admittedly understated would, standing alone, necessarily establish the presence of a fraudulent intent to evade tax in the making of the returns. Our difficulty is in knowing whether or to what extent the uncorroborated testimony of the petitioner is to be believed. The crux of the problem here is whether and to what extent Ralph Banford was telling the truth when he testified that, the cash or sales books not being designed or intended to reflect the total receipts of the business, he compiled the total receipts directly from the contracts themselves and, after deducting the cost of goods sold, the resulting amounts, plus for the years 1946 and 1947 the rent received, were reported to Martha Kistler and Lucille Veidt as total profits, but were mistakenly entered by them on the returns as total receipts, and the resulting understatements of net income and the tax thereon were due to the above mistake and to his ignorance and lack of knowledge in the reporting of income, and not due to fraudulent *133 intent to evade tax. Whatever the character or source of the amounts reported by petitioner to Martha Kistler and Lucille Veidt and entered by them on the returns as total receipts from the business may have been, we do not believe much of petitioner's testimony with respect thereto. Although testifying that the cash or sales books did not reflect the total receipts of the business and that the receipts as compiled by him were taken directly from the contracts themselves, the record further shows, according to his own testimony, that when in the course of the investigation by the respondent's agent Robin Banford, in his presence, offered the contract records which were on hand to the respondent's agent and their own accountant and was told by their accountant that they didn't need the contracts but were using the "journal," that is, the cash or sales book, petitioner remained silent and did not advise them as to the deficiencies of the so-called journal, that the total income of the business could not be checked or determined therefrom, or that he, in preparing the data for the returns, compiled the receipts directly from the contracts themselves. He was asked if he pointed out that *134 some of the contract sales would not appear on the sales journal, and replied that he didn't because he never thought anything about it. He didn't know whether "she had them all," that is, the contracts, or not. We have no doubt that if, in the making of the returns, he had, in an honest endeavor to report all the receipts from the business, compiled such receipts directly from the contracts because the cash or sales books or journals did not cover all of the contracts on which business receipts were realized, he would have so advised the accountant when he heard him state they were using the cash or sales books or journals for that purpose. [3] Ignorance or lack of understanding of income tax return forms or other requirements in reporting income and computing the tax thereon could have played no part in his failure to speak, under the circumstances, if in fact he had, in making the returns, compiled the total receipts from the contracts, as he has testified before us he did. In short, we don't believe his account of what was done. *135 Aside from the above, there are other parts of petitioner's testimony which are contradicted by other evidence of record. Some of these contradictions are somewhat puzzling, since it is not readily apparent that, even if they had been believed, they would have helped petitioner's case. One such instance is found in his testimony as to the source of the funds used in the purchase of his residence in January of 1945. His testimony was that in paying for the house some $5,000 or more which had been accumulated in prior years was taken from a jar in the basement of his home, deposited in the bank and paid for the new residence. It was stipulated that the residence was purchased on January 23, 1945, for $8,800. A transcript of the deposits in the bank account from February, 1943, through December of 1947, was attached as an exhibit to the stipulation. That transcript shows a deposit of $2,000 on January 24, 1945, but no deposit of as much as $500 for more than a month preceding, and no deposit in excess of $684.88 thereafter, until March 6. The stipulation of facts further shows that the house was still mortgaged at December 31, 1945, for $5,843.45. We are inclined to the view that a *136 more likely explanation would have been that even the $2,000 which was deposited in the account on January 24, 1945, came from a savings account. The stipulation shows that the balance in the savings account at December 31, 1944, was $5,016.66, and that there was no balance at December 31, 1945. The transcript of the bank deposits shows, in addition to the deposit of $2,000 on January 24, 1945, a further deposit of $3,016.66 on March 6, 1945, just prior to the purchase of the business property. Just why, in the light of the absence of any deposits such as petitioner described which could account for the money said to have been accumulated in the jar, and the further facts of record indicating that the residence was not paid for at or within a few weeks of the purchase date, as testified, the petitioner saw fit to testify concerning non-existent deposits in the bank account, is not at once apparent. It is some indication, however, we think, of petitioner's willingness to testify as to the occurrence of things which never happened. With respect to the omission of rent from the apartments in the reporting of income for the years 1946 and 1947, there are also unexplained discrepancies *137 or contradictions of record. It was the petitioner's testimony that the rent received amounted to only $50 per month, and that it was included in the amounts which he reported to Martha Kistler and Lucille Veidt as total profits for each of those years. And yet, the petitioners, with the apparent approval of their accountants, have admitted to the correctness of a net income for each of those years which was attributable in part to the inclusion as rent received on the apartments of $1,068 in each of the years mentioned. And here again we have an understandable conflict between petitioner's oral testimony and admissions otherwise appearing of record. In the light of the facts admitted and other facts clearly established by the evidence, we have found ourselves unable to give credence to much of the testimony given by petitioner, and after considering and studying the record as a whole, we are convinced that a part of the deficiency for each of the years herein was due to fraud with intent to evade tax, and we have so found. Decision will be entered for the respondent. Footnotes
1. A few days prior to the purchase, a deposit of $3,016.66 was made in the account. The testimony at first was that this amount represented the proceeds of a loan, but later testimony raised doubts as to the correctness of the earlier testimony, and there are facts of record which indicate that the said amount could have been transferred from a savings account.↩
2. On September 12, 1946, Ralph Banford filed an amended return for 1943. Whether this return form was filled in and the tax reported thereon was computed by Martha Kistler is not clear. As to Lucille Veidt, petitioner testified that as to one year she told him it would be necessary to include in income a refund which had been received from the Stove Company in respect of goods damaged in shipment and for which a deduction had been taken in a prior year.↩
3. Interestingly enough, he knew his wife could not have had all of the contracts for all years, if testimony he had given a few moments before was true. He had testified that the contracts had been stored in the basement and had been ruined or destroyed by a flash flood in 1945 or 1946. Such an occurrence, even if true, would not have affected the 1947 contracts and even all of the contracts for 1946 might have still been available.↩